## Case No. 14,964.

UNITED STATES v. DISTILLERY, ETC., OF J. C. McCOY et al.

[21 Int. Rev. Rec. 165.]

District Court, D. Nebraska. May Term, 1869.

FORFEITURE — BOND TO ANSWER — TITLE TO FORFEITED PROPERTY — MECHANIC'S LIEN.

1. The title to property forfeited for wrongful and fraudulent acts passes by the operation of law to the United States at the moment of the commission of the acts causing the forfeiture, and the acceptance of a bond to answer a judgment against the claimants to the property forfeited does not reinvest the title in them.

[Cited in Dobbins' Distillery v. U. S., 96 U. S. 402.]

2. A modification of this rigid rule of law is allowed in this case in favor of the mechanics' liens of those who furnished the material and machines by which the property has been built up and made more valuable, but without passing judgment as to their legal title, and solely on the plea "that no great injustice could result therefrom to the government, whilst a refusal to apply a part of the fund to the payment thereof might result in the greatest injustice."

[This was a suit to forfeit the distillery and rectifying establishment of J. C. McCoy & Co. Judgment of forfeiture entered.]

Strickland, Mason, Kennedy, and U. S. Atty. Neville, for the government.

Redick, Woolworth, Doane & Kennedy, for creditors.

G. W. Ambrose, for the assignee in bankruptcy.

General Estabrook, for Lamaster, claiming as informer.

Mr. Kennedy, for Copeland, claiming as informer.

Judge Wakely, for Haynes and Brewer, sureties in the release bond.

DUNDY, District Judge. Heard on application for distribution of finances in registry of court. This case is perhaps the most remarkable one ever brought in this court. It is peculiar in some, and of the first importance in many, respects. The complicated questions arising during the several stages through which the cause has passed; the magnitude of the interests involved; the lapse of time since the institution of the suit; and the great number of eminent counsel engaged both for and against the government, all combine to give additional interest to the proceedings. For general convenience, a history of the origin and progress of the litigation growing out of the original seizure of the distillery and rectifying establishment seems necessary, as well as proper. The distillery and rectifying establishment was seized and closed up by a government officer, on the 22d day of December, 1868. On the 28th of the same month, the United States attorney filed an information on which the property was afterwards condemned, as forfeited to the United States. This information charged the said McCoy and Co., with the commission of several criminal acts which led to the seizure of the property in question. These criminal acts are alleged to have been committed on the 13th day of October, 1868, and on other days subsequent thereto. The verdict of the jury sustains the truth of the allegations in the information.

On the 14th day of January, 1869, the distillery and rectifying establishment, together with a large amount of personal property, were released on bond given by McCoy and Co., claimants. On the 2nd day of September, 1869, trial was had, and the verdict of the jury was for the government. A judgment of condemnation followed this verdict on the 2nd day of September, 1869. On the 14th day of February, 1870, an order was made directing the marshal to sell the distillery and rectifying establishment and to bring the proceeds arising from the sale into court to abide its further order. The sale was duly made by the marshal and the proceeds, amounting to the sum of $14,900.00, brought into court to be applied as the court might further direct. This sale was confirmed by the court and a deed made to the purchaser by the marshal. On the 30th of April, 1869, and during the progress of the cause, proceedings in bankruptcy were instituted against McCoy and Co., which eventually resulted in their being adjudicated bankrupts. Shortly before, and soon after this several suits were commenced in the state court against McCoy and Co., in most of which judgments were rendered by default for the whole amount claimed to be due. The several judgment creditors claimed to have liens on the property sold, and now apply for the money realized on the sale of the same. The judgment of Winehagen and Hanbostle was rendered on the 29th day of April, 1868, for the sum of $8,375. Judgment of I. B. Fleming was obtained on the 14th day of October, 1868, for $1,527. Judgment of Hastings, Ledyard and Co., on the 16th day of October, 1868, for $2,668.38. Judgment

of Hoagland, based on a mechanic's lien, was obtained on the 29th day of June, 1869, for $2,229. The lien was for materials furnished, between the 17th of September, 1868, and the 15th of December, of the same year. Judgment of W. P. Anderson, on the 20th day of October. 1869, for $978.19. Harris and Fortus, judgment, on the 2nd day of July, 1870, for $1,360, is also based on a mechanic's lien for materials furnished between 13th day of September, 1868, and the 6th day of February, 1869. In addition to these alleged liens, the Council Bluffs Iron Works Co. claims a mechanic's lien for the sum of $2,800, for materials furnished between the 17th of February, 1868, and the 23d of February, 1869. Fitzpatrick also claims a balance due on a mechanic's lien, of $119.35. This was for materials furnished between the 14th of October, 1868, and the 12th of March, 1869. At the time the distillery was seized, there was due from McCoy to the government about $3,110 taxes, which constituted a valid lien on the premises seized. Before the time of making the order in which the marshal was directed to sell the property seized, the United States had commenced suit in the circuit court against McCoy and Co., with whom were impleaded all of the above named creditors of McCoy and Co., the object of which was at least in part to settle the question of lien, between the government and the said parties. This suit was commenced on the 15th day of January, 1870; hence the order directing the proceeds arising from sale, to be brought into court to abide its further order. The second amended bill was not filed in that case until December, 1871. After the issues were made up, a large mass of testimony was taken, the cause tried in the circuit court and the bill was there dismissed. And by common consent of all parties in interest, the record in the case in that court was transmitted to this court, where the questions there raised were to be decided. That cause was decided at the November (1872) term of the circuit court. At the October (1873) term of this court a question was submitted to a jury relative to the disputed facts between two parties who claimed a moiety as informers. At the same term of court, counsel on behalf of Omaha City and Douglas county, asked leave to file a claim for taxes said to have been assessed and on the distillery.

These facts constitute the basis upon which the original proceedings were instituted, upon which this cause has been conducted, and upon which (at least so far as this court is concerned) it is to be finally disposed of.

At the time of seizing the property by the revenue officers, the distillery and rectifying establishment was closed up, and thereafter held by them until the same was released on bond. After the release, the distillery was run for a short time, when it was abandoned by the owners, who soon after fled from the state. The property, mainly for the want of better care than could be bestowed on it by the government officers, began to rapidly depreciate in value. This fact was made to appear from the statement of parties in interest and from a personal inspection of the premises. And it was thought to be for the best interests of all concerned to have the property sold at as early a day as practicable, and to have the proceeds brought into court, when such as might desire so to do could apply for and receive the proceeds, should they be found entitled thereto. It is claimed, however, that a portion only of the parties in interest consented to the making of the order in question. The testimony seems to be conflicting upon that point. But suppose no consent was given by any one of the parties—suppose that instead of consenting, each and every one of them had protested against making the order as some of them do here now, could that possibly affect the validity of the order? Manifestly not. The court either had, or had not the authority to make the order of sale. If the authority to make it existed then no consent of a creditor, whether judgment creditor or not—who was not a party to the suit—who had in no way intervened, was necessary to give validity to the order; if the court had not the lawful authority to make the order, then certainly the lien holders consenting thereto would not confer the right to make any such an order. There can be no reasonable doubt of the jurisdiction of the court in this behalf. As the property was lawfully seized it was eventually condemned and forfeited to the government for violations of the revenue law committed with and about it by McCoy and Co., the owners. There is no question about the validity of the seizure nor the binding force of the judgment of condemnation. But the sole objection seems to be to the validity of the order directing the marshal to sell the identical property seized. At the time this order was made, McCoy and Co. had the legal title to the property seized, unless that title was vested in the United States by operation of law, at the time McCoy and Co. committed the wrongful acts that led to the seizure. Now, if those wrongful acts divested McCoy and Co. of the title, and vested it in the United States, then there can be no question about the validity of the order. If the title still remained in McCoy and Co., then most clearly it was subject to buy and sell to satisfy the judgment rendered against them, and after the judgment was entered on the bond, and execution issued thereon the marshal was clearly justified in proceeding to take and sell the property as that of McCoy and Co., to satisfy the said judgment. This he could have done as well without as with the order of sale to which objection is here made. Any property which McCoy and Co. had in this state was subject to seizure and sale to satisfy the judgment. And it was the duty of the marshal to first exhaust the property of the principals before proceeding to take the

property of the surety in the release bond. It seems then that no valid or lawful objection existed against making the order of sale. The propriety of making the order at the time it was done cannot well be questioned, as the property sold for very much more than it was originally appraised at. Besides, since the sale was made by the marshal, and down to the time of hearing of the case in the circuit court, the government had realized something over two hundred and thirty thousand dollars out of the distillery in the shape of taxes. If any other or further indication of the action of the court in making the order of sale be necessary, it will be found in the opinion of the circuit judge, delivered by him in the case before referred to. It follows from these views that the money is properly in this court, awaiting its further order.

The property was seized and condemned under the act of congress of July 20, 1868 (15 Stat. 162). The amended information contains several counts or distinct charges and specifications in most of which it is distinctly stated that McCoy and Co. committed the wrongful acts which led to the seizure and caused the forfeiture on the 13th day of October, 1868, and on other days between that date and the 22d day of December, the time of the seizure. One of the principal charges is that on the 13th day of October, 1868, McCoy and Co., after the survey and registration of the distillery, enlarged the producing capacity of the distillery without giving notice to the assessor, with intent to defraud the United States. The other charges of fraud are both numerous and important, but need no further notice here. The verdict of the jury was for the government "on all the issues joined," of which the specification above stated was one.

It will be seen, then, that the wrongful and fraudulent acts that caused the forfeiture of the distillery were committed on the 13th of October, 1868. At the date last stated the wrong was done, the fraud committed and the property forfeited. The moment the fraudulent act is committed which causes the forfeiture, the owner is divested of the property, and the title, by operation of law, changes and vests in the United States. So in this case, the title of McCoy and Co. was lost, notwithstanding they retained possession of the property for a time after the commission of the fraud. In all such cases, and in that one, the property was seized and held for a time for the purpose of protecting the rights of the government, and the object to be gained in instituting proceedings to condemn property so seized is to have a judicial determination of the question of right involved between the claimants of the property and the authority that seizes the same. So far as this distillery is concerned, it has been judicially determined that the title of McCoy and Co. to the same was divested on the 13th day of October, 1868, and parties who dealt with them after that date before as well as after

the seizure, did so at their own risk and peril, and as the property was at all times within the jurisdiction of the court, it cannot be said that the United States relinquished or in any way abandoned the right and claim thereto, notwithstanding bond was given to answer whatever judgment might be recovered against the claimants. If a fraud had been committed upon the court in procuring the approval of a bond with worthless sureties, would that fact have exempted the property from being further proceeded against as was done in this case, especially when the property had never changed hands after the seizure? We think not. Was anything of this kind attempted by the sureties on the bond in this case? It is unnecessary perhaps to pursue this inquiry, as it is enough to say that the sureties justified on oath, each swearing that it was worth $1,600.00 in unencumbered real estate in this state, and that it is a matter of general notoriety that the sureties have long since left the state, and are believed to be out of reach of ordinary executions. It cannot therefore be seen that the act of releasing the distillery on bond would reinvest the title to the same in McCoy and Co. And if it did not so reinvest it, then no person could acquire an interest in the property after the act of forfeiture was committed, or at least after the time of the seizure. The circuit court, in the case before referred to, must have taken this view of the case, otherwise it would be difficult to see on what principle the court there decided that "in any event all the interest of McCoy and Co. in the property was forfeited to the government, and this forfeiture has been judicially ascertained and decided, and therefore it is not perceived what interest the bankrupts' estate has in the fund." The judge in delivering his opinion in that case further says, that "at the time of the sale the United States was the owner of the property, under a forfeiture judicially ascertained, and had been such owner from the time of the violation of the law for which it was seized." Keeping these principles in view and with such light for a guide, the questions of lien presented for consideration will be decided according to the views here expressed. So far as the record shows McCoy and Co. never held the legal title to the lot of ground on which the rectifying establishment was situated; and for aught that is known, no title to the fee in that case really passed to the purchaser under the marshal's hand. Whatever title McCoy and Co. and the United States had in the lot, may have passed to the purchaser, but nothing more than that appears from the record. And McCoy and Co. may or may not have had such an interest in that lot as would have been bound by a judgment in the state court. The proceeds arising from the sale of the rectifying establishment, excepting the marshal's percentage on the sale of the same, is awarded to the United States, and is to be credited on the decree accordingly. McCoy and Co.

acquired title to lot 4, on which the distillery was located, on the 13th day of August, 1868. At the time of the rendition of a judgment in the state court, all of the real estate of the party against whom the judgment is obtained, if situated in the county where judgment is rendered, became bound for the payment thereof. But lands acquired by a judgment debtor after judgment rendered, are not bound thereby, until execution issues and is levied thereon. Under the Code practice as understood and practiced in this state, argument is unnecessary to demonstrate the truth or correctness of this proposition. This view of the case necessarily disposes of the alleged lien of the judgment of Winehagen and Hanbostle, which was rendered in the district court of Douglas county on the 29th day of April, 1868. And as no execution seems to have been issued, or levy made on the property, at any time before the 13th October, 1868, at which time the property became forfeited, this claim must be rejected. The judgment of J. B. Fleming, obtained in the same court on the 14th day of October, 1868, was after the commission of the act of forfeiture, and the title vested in the United States. There was no lien created in this case, by the entry of this judgment, and the claim must therefore be rejected. The judgment of Hastings, Ledyard and Co., was rendered on the 16th of October, 1868, and stands on the same footing as the last above described. The same is true of the judgment of W. P. Anderson, obtained the 20th of October, 1869. The claims in the two cases last stated must be rejected.

A question of greater difficulty is presented with respect to the claims of those who filed mechanics' liens against the distillery. In the case before referred to the circuit court expressly refused to pass upon the validity of these liens as against the government, and no adjudicated case have I been able to find, where such questions have been determined. And if these views heretofore expressed are correct, then a rigid application of the rule stated (i. e. that a person dealing with another after the commission of the act of forfeiture, would do so at his own risk) would exclude any interest of the parties supposed to have been acquired after the 13th October, and the time of releasing the property on hand. Under the mechanic's lien law of this state, as it existed in the years 1868 and 1869, persons who furnished material or machinery for the erection of buildings or construction of mills or manufactories, were entitled to a mechanic's lien to secure payment therefor; to secure the lien, it was necessary to file the same within four months from the time of furnishing the last material or machinery. The law in this respect seems to have strictly been complied with by all the parties, who are here claiming under and by virtue of their mechanics' liens, and ordinarily no difference would be experienced in enforcing these liens in the state court. It seems that these parties commenced to furnish the materials on the 18th of February, 1868, and concluded on the 12th of March, 1869. A portion of the same was furnished after the commission of the acts of forfeiture by McCoy and Co., and before the seizure, and also after the property was released on bond. The great and most difficult question raised in this connection, and which must of necessity be here determined, is as to what effect the forfeiture had on these several mechanics' liens. If a rigid rule of law should be here applied and enforced, it might be that the claimants would be without a remedy to enforce their alleged rights. But if a more enlarged and liberal view is to be taken, and an equitable disposition of the fund is to be made, then the claims of these several lien holders may be respected, and their rights secured. I confess I have serious doubts about this, and have no opinion thereon that I may not feel bound to abandon and disown tomorrow. Of one thing, however, I feel quite well assured, and that is if these material men and machinists who furnished material and machinery for the distillery are paid their just claims out of the proceeds of the sale of the property, which their material and machinery had built up and made valuable, that no great injustice could result therefrom to the government, whilst a refusal to apply a part of the fund to the payment thereof might result in an act of the greatest injustice. And when the duty of the court to make other disposition of the money is not clear, I prefer to apply the money where the least injustice will be done. There can then be no doubt about where the money is to be applied. I conclude then, that the amount due on the lien of the Council Bluffs Iron Works Co., amounting to $2,888.60; the lien of Hoagland amounting to $2,229.05; the lien of Fitzpatrick amounting to $119.35, and the lien of Harris and Foster for $1,369.00 must be paid out of this fund. No costs, however, will be allowed on any of these claims, as the suits in the cases of Hoagland and Harris and Foster, were commenced and prosecuted in the state court after the property was seized, and after proceedings in bankruptcy were commenced against McCoy and Co.

On the 24th day of November, 1873, the city of Omaha and Douglas county filed written applications for a portion of the money to be applied to the payment of taxes said to have been assessed against McCoy and Co., a part of which was assessed on the property sold. It nowhere appears that the district attorney or any of the several claimants had any notice of the filing of these claims. Such notice ought to have been given to the district attorney, at least, so as to have given him an opportunity to attack the validity of the tax, had he seen proper to do so; especially as the cause had been fully submitted to the court before the filing of the claims. These claims may be, and perhaps are meritorious ones, but as the applications now stand, both must be rejected. Order of dis-

solution will be made conforming to the views here expressed.

I find on the files an application made by private counsel for an allowance out of this fund for services rendered during the progress of the trial. The assistant counsel was employed under an order made by the secretary of the treasury, and as the court made no order directing the services to be performed, and as the counsel were not subject to the control of the court, it is not apparent that the court has the right to make the order desired.

Just before the close of the last term of court, for my own convenience, and owing to the great amount, and conflicting character of the testimony on the subject, I submitted to a jury the questions in dispute between the two persons who claimed to be informers. The jury found that the two acted in concert, and both gave information at the same time which led to the seizure of the property. Of course, this verdict has no binding force, but it is so manifestly just, as appears from the testimony, that the finding of the jury will be adopted as the finding of the court.

The fund now in the registry of the court ought to be distributed and applied as follows: Out of the fund realized from the sale of the rectifying establishments ($2,800) pay: First. The marshal's fee for selling. Second. The balance to be credited on the decree. Out of the fund realized from the sale of the distillery, on which liens were filed: First. All costs and expenses incurred for the seizure, trial, condemnation and sale of the whole of the property seized, including any allowance to officers of the court, in lieu of fees or otherwise. Second. The mechanic's lien heretofore described of the Council Bluffs Iron Works Company for $2,883.60.

Hoagland for .......................$2,229 05
Fitzpatrick for .................... 119 35
Harris and Foster for ........... 1,369 00

—And the balance of the said fund to be applied to and credited on the decree. And it is so ordered. Owing to the voluminous record, and the amount of labor required in conjunction with the clerk and marshal to tax the cost bills, the case will be referred to General Manderson, a member of the bar, to tax the costs, make distribution of the fund, and to report the same to this court on the first day of the next (May) term thereof.